IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOIAKAH GRAY (K-70373), | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 11 C 5513 |
| DR. PARTHA GHOSH, DR> CATALINO BAUTISTA, DR. RICHARD SHUTE, DR. IMHOTEP CARTER, KEVIN HALLORAN, MARCUS HARDY, COLLEEN FRANKLIN, and DARRYL EDWARDS, | ) Judge Feinerman |
| Defendants. | ) |

**M<span>EMORANDUM</span> O<span>PINION AND</span> O<span>RDER</span>**

Doiakah Gray, an inmate at Stateville Correctional Center, filed this *pro se* suit under 42 U.S.C. § 1983, alleging deliberate indifference to his medical condition in violation of the Eighth Amendment. Doc. 6. The claims against the defendants employed by the Illinois Department of Corrections—Marcus Hardy, Colleen Frankin, and Darryl Edwards—have been dismissed pursuant to a settlement. Docs. 109, 111. The defendants employed by Wexford Health Sources, the provider of health care services to Stateville prisoners—Dr. Partha Ghosh, Dr. Richard Shute, Dr. Catalino Bautista, Dr. Imhotep Carter, and Kevin Halloran—have moved for summary judgment. Doc. 96. The motion is granted in part and denied in part. The claims against Dr. Shute, Dr. Bautista, and Kevin Halloran are dismissed, while the claims against Dr. Ghosh and Dr. Carter will proceed to trial.

**Background**

Before proceeding with a recitation of the facts, the court addresses Gray's belated motion for leave to file a Local Rule 56.1(b)(3)(C) statement of additional material facts. Doc. 115. The Wexford defendants filed along with their summary judgment motion a Local Rule

56.1(a)(3) statement of facts. Doc. 96-1. Gray filed an opposition brief and a Local Rule 56.1(b)(3)(B) response, Docs. 99-100, but not a Local Rule 56.1(b)(3)(C) statement of additional facts. The Wexford defendants then filed a reply brief in support of their motion. Doc. 103. At that point, the summary judgment record closed.

Months later, Gray moved for leave to file a Local Rule 56.1(b)(3)(C) statement of additional facts. Doc. 115. As a justification for his late filing, Gray complains that the Wexford defendants did not serve him with a Local Rule 56.2 notice, which informs *pro se* litigants of the requirements and procedures for opposing a summary judgment motion. *Id*. at 2. If in fact the Wexford defendants' (alleged) failure to serve Gray with a Local Rule 56.2 notice deprived him of the knowledge that he could file a Local Rule 56.1(b)(3)(C) statement of additional facts along with a Local Rule 56.1(b)(3)(B) response, then the court would have granted his motion. But it is beyond dispute that Gray knew full well that he could have filed a Local Rule 56.1(b)(3)(C) statement. By the time his response papers were due in this case, Gray had received Local Rule 56.2 notices in at least two other cases. *See Gray v. Cent. Pub'n Review Comm.*, No. 11 C 4870 (N.D. Ill.), Doc. 86 (Dec. 19, 2012); *Gray v. Ghosh*, No. 12 C 194 (N.D. Ill.), Doc. 75 (Nov. 29, 2012). In fact, Gray actually *filed* Local Rule 56.1(b)(3)(C) statements of additional facts in those cases. *See Gray*, 11 C 4870, Doc. 94 at 11-12 (Jan. 7, 2013); *Gray*, 12 C 194, Doc. 84 at 6-7 (Dec. 14, 2012). There accordingly is no legitimate excuse for Gray's failure to timely file a Local Rule 56.1(b)(3)(C) statement in this case, and thus no legitimate justification to re-open the summary judgment record. *See Kincaid v. Vail*, 969 F.2d 594, 599 (7th Cir. 1992) (holding that the summary judgment movant's failure to serve a Local Rule 56.2 notice on a *pro se* non-movant is without legal significance "if no prejudice resulted." ); *Timms v. Frank*, 953 F.2d 281,

286-87 (7th Cir. 1992) ("[I]n light of Timms's inability to show that the lack of notice prejudiced her, the district court's grant of summary judgment is affirmed."); *Santiago v. United Air Lines, Inc.*, 969 F. Supp. 2d 955, 959-60 (N.D. Ill. 2013). Gray's motion for leave to file a Local Rule 56.1(b)(3)(C) statement of additional facts is therefore denied.

The following facts are stated as favorably to Gray as permitted by the record and Local Rule 56.1. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Gray is an inmate at Stateville Correctional Center. Doc. 100 at ¶ 1. He first reported chest pains in August 2000. *Id*. at ¶ 3. On December 22, 2005, he had an electrocardiogram ("EKG"), which reported a "normal sinus rhythm." *Id*. at ¶ 4; Doc. 96-4 at 31.

In 2006, Gray was sent to the medical facility at the University of Illinois at Chicago ("UIC"), where he had a cardiac evaluation with a Holter heart monitor. Doc. 100 at ¶ 5. The record does not include a report of the results, but a June 29, 2006, report from the attending UIC cardiologist, Dr. Adhir Shroff, states that Gray's "holter did not demonstrate any significant electrical abnormalities despite the pt having symptoms." *Id*. at ¶ 7 & p. 18. Dr. Shroff did diagnose Gray with hypertension, prescribed blood pressure medication, directed that Gray's blood pressure be checked once a month, and further directed that he see a cardiologist in one year. *Id*. at ¶ 7. Gray had another EKG on November 3, 2008, which revealed a "normal sinus rhythm." *Id*. at ¶ 8; Doc. 96-4 at 38.

On August 19 and 25, 2010, Gray was evaluated for heart palpitations. Doc. 100 at ¶¶ 10-11. On October 14, 2010, during an examination by Dr. Ghosh, Stateville's medical director at the time, Gray complained that he experienced heart palpitations once or twice per day, with each episode lasting thirty to forty seconds, as well as shortness of breath, dizziness,

and slight chest pain. *Id*. at ¶¶ 12-13. Dr. Ghosh's progress notes state that Gray reported that he had experienced similar heart palpitation episodes seven to eight years earlier. *Id*. at ¶ 14; Doc. 96-4 at 42.

On October 14, 2010, Gray had another EKG, which again revealed a "normal sinus rhythm." Doc. 100 at ¶ 15; Doc. 96-4 at 43. That same day, Dr. Ghosh prepared a referral for Gray to see a cardiologist at UIC. Doc. 100 at ¶ 16. On November 1, 2010, lab reports showing a complete metabolic panel and blood count for Gray were sent to UIC. *Id*. at ¶ 17.

On December 20, 2010, Wexford's utilization management physician, non-defendant Dr. Garcia, concluded that the request to send Gray for a cardiology consultation was "not authorized" due to "insufficient information." *Id*. at ¶ 19 & p. 27. Dr. Garcia's notes state:

> Received request from Dr. Ghosh for cardiology evaluation for a 32-year-old patient with history of episodic palpitations 1 to 2 times a day. Last for about 30 seconds. Complains of lightheadedness. No SOB. No chest pain. Report symptoms have been present for approximate 3 months. Reviewed by Dr. Garcia who requests current and any recent past EKG reports, chest x-ray report, and medication list.

*Id*. at p. 27. The Local Rule 56.1(a)(3) statement and Local Rule 56.1(b)(3)(B) response reference no reports from Dr. Ghosh and provide no indication that he arranged to send the materials that Dr. Garcia had requested. Dr. Ghosh's tenure as Stateville's medical director ended on March 31, 2011. *Id*. at ¶ 35.

On April 14, 2011, Dr. Shute, the new Stateville medical director, signed a document indicating that an alternate medical plan for Gray would be put in place. *Id*. at ¶ 20. The Local Rule 56.1(a)(3) statement and Local Rule 56.1(b)(3)(B) response do not reference any other notes or reports from, or examinations by, Dr. Shute. Nor do Local Rule 56.1(a)(3) statement and Local Rule 56.1(b)(3)(B) response reference any reports or notes from Dr. Bautista, who was

-4-

Stateville's medical director from May 31, 2011, to July 24, 2011. *Id.* at ¶ 36. Gray was never examined by either Dr. Shute or Dr. Bautista. *Id.* at ¶¶ 31, 33. Kevin Halloran, the Chairman of Wexford Health Sources, had no direct involvement in the care or treatment of Gray. *Id.* at ¶ 44.

The record contains no indication that Gray was examined by a physician or given additional tests until March 2012. On March 9, 2012, Dr. Carter, who replaced Dr. Bautista as Stateville's medical director on July 25, 2011, ordered a 12-lead EKG for Gray and prescribed Propranolol and Prilosec. *Id.* at ¶¶ 21, 38. Dr. Carter noted that Gray had experienced chronic but non-severe heart palpitations for eight years, and that he had been given a full cardiac exam with a Holter monitor in 2006. *Id.* at ¶¶ 22-23. Dr. Carter further noted that Gray's heart rate had no thrill or gallop, and he ordered an EKG, a TSH (possibly a Thyroid Stimulating Hormone test), and a CMP (Comprehensive Metabolic Panel). *Id.* at ¶¶ 24-25. (Gray denies that a TSH and a CMP were performed, but the record material he cites does not show this, so his denial is disregarded.) The EKG from March 15, 2012, like Gray's prior EKGs, showed "normal sinus rhythm." *Id.* at ¶ 26; Doc. 96-4 at 47. On March 21, 2012, Gray was noted as having chronic palpitations and was given Propranolol and Prilosec. Doc. 100 at ¶ 27. The record includes no reports or notes from Dr. Carter after March 2012.

In June 2012, non-defendant Dr. Abbasi discontinued Gray's Propranolol and prescribed Atenolol instead. *Id.* at ¶ 28. Gray's heart palpitations subsided, but did not stop, while he was taking Atenolol. *Id.* at ¶ 29.

Gray filed two grievances concerning the medical treatment at issue in this case. *Id.* at ¶ 39. The first grievance, dated January 25, 2011, "was filed against Dr. Ghosh and only Dr. Ghosh." *Id.* at ¶¶ 40-41. That grievance charged that Gray was not sent to UIC for tests with a

heart monitor as Dr. Ghosh had previously directed and that, on December 15, 2010, January 2, 2011, and January 15, 2011, Gray informed Dr. Ghosh that his heart palpitations had increased and were causing him pain. Doc. 96-3 at 41-42. A February 10, 2011, response to that grievance stated that Gray had been submitted for an examination at an outside hospital, but that the date for the appointment had not been set. *Id*. at 41. The second grievance, dated August 2, 2011, "was directed against whatever medical director was in the position at the time," which was Dr. Carter. Doc. 100 at ¶¶ 38, 42-43. Gray again complained that he had been referred for a cardiac exam with a heart monitor, but that such an exam never occurred. Doc. 96-3 at 40.

## Discussion

### I. Claims Against Dr. Bautista and Dr. Shute

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 … until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of available administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (internal quotation marks omitted). To satisfy the exhaustion requirement, a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Dr. Shute and Dr. Bautista argue that Gray did not satisfy the PLRA's exhaustion requirement as to the claims against them. Doc. 96-2 at 6-7. They are correct.

As noted above, it is undisputed that Gray filed two grievances concerning the medical treatment in this case. Doc. 100 at ¶ 39. Gray admits that the first grievance, dated January 25,

2011, "was filed against Dr. Ghosh and only Dr. Ghosh." *Id*. at ¶ 41. The grievance itself complains about Dr. Ghosh, and it does not mention Dr. Shute or Dr. Bautista by name or otherwise describe them. Doc. 96-3 at 41-42. Gray admits that the second grievance, dated August 2, 2011, "was directed against whatever medical director was in the position at the time," which was Dr. Carter. Doc. 100 at ¶¶ 38, 43. Like the first grievance, the second grievance does not mention Dr. Shute or Dr. Bautista by name or otherwise describe them. Doc. 96-3 at 40; *see also* Doc. 96-4 at 18 (where Gray admitted at his deposition that "the [second] grievance wasn't directed towards" Dr. Bautista).

Given these undisputed facts, Gray failed to exhaust his administrative remedies as to Dr. Shute and Dr. Bautista. Governing precedent holds that to exhaust remedies as to a particular individual, the inmate's grievance must indicate "that [the individual] was the target." *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014). The inmate can do this by naming the individual in the grievance or, if the inmate does not know the individual's name, by "includ[ing] as much descriptive information about the individual as possible." *Id*. at 235-36 (internal quotation marks omitted). Gray's grievances does neither of these things and, as just noted, Gray affirmatively admits that his grievances were not directed against Dr. Bautista or Dr. Shute. It follows that Gray did not exhaust his administrative remedies as to those two defendants. *See id*. at 236. The claims against them are dismissed without prejudice. *See Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004) (holding that "*all* dismissals under § 1997e(a) should be without prejudice"); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("Dismissal for failure to exhaust is without prejudice and so does not bar the reinstatement of the suit unless it is too late to exhaust ….").

## II.     Claims Against Halloran

As noted above, it is undisputed that Halloran, the Chairman of Wexford, "had no direct involvement in the care or treatment of Plaintiff." Doc. 100 at ¶ 44. The factual assertions in the Wexford defendants' Local Rule 56.1(a)(3) statement and Gray's Local Rule 56.1(b)(3)(B) response say nothing else about Halloran. Because the summary judgment record does not indicate that Halloran had any involvement in Gray's care and treatment, and because § 1983 liability requires personal involvement and may not be based on *respondeat superior*, the claims against Halloran are dismissed with prejudice. *See Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) ("to be liable under § 1983, an individual defendant must have caused or participated in a constitutional deprivation") (internal quotation marks omitted); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable").

It is true that Gray's brief makes certain factual assertions about Halloran. Doc. 99 at 17-19. But because those assertions are not presented in a Local Rule 56.1(b) response or statement, they are disregarded on summary judgment. *See Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of … presenting additional facts to the district court"); *Bolden v. Barnes*, 2013 WL 5737359, at *2 (N.D. Ill. Oct. 22, 2013) (disregarding facts in the plaintiff's response brief that were not properly set forth in a Local Rule 56.1 statement or response); *Dunhill Asset Servs. III, LLC v. Tinberg*, 2012 WL 3028334, at *3 (N.D. Ill. July 23, 2012) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.") (internal quotation marks omitted); *Garner v. Lakeside Cmty.*

*Comm.*, 2011 WL 2415754, at *1 n.1 (N.D. Ill. June 13, 2011) ("the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)[C] statement of additional facts"); *Curtis v. Wilks*, 704 F. Supp. 2d 771, 789 (N.D. Ill. 2010) ("Any facts plaintiffs assert in their response brief that were not included in their LR 56.1 submissions will not be considered."); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("facts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material").

### III.    Claims Against Dr. Ghosh and Dr. Carter

To prevail on his claims against Dr. Ghosh and Dr. Carter, Gray must show that they "display[ed] deliberate indifference to a serious medical need." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference has an objective element, that the plaintiff's medical condition be "objectively serious," and a subjective element, that the defendants "acted with a sufficiently culpable state of mind" in that they had "subjective knowledge of the risk to the inmate's health and … disregard[ed] that risk." *Thomas*, 604 F.3d at 301 (internal quotation marks omitted). Dr. Ghosh and Dr. Carter challenge both elements of Gray's claim.

With respect to the first element: "An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (internal quotation marks and citation omitted). As noted

above, Gray was diagnosed with stage 1 hypertension, was prescribed daily blood pressure medication, and was directed to have his blood pressure checked once per month; Gray also complained of heart palpitations, and he received medication for that as well. Both conditions were diagnosed as mandating treatment, and both thus qualify as objectively serious. *See Jackson v. Pollion*, 733 F.3d 786, 789 (7th Cir. 2013) ("Hypertension is a serious condition. Untreated [for an extended period of time,] it can result in strokes or heart attacks."); *Roe v. Elyea*, 631 F.3d 843, 861-62 & n.15 (7th Cir. 2011) ("our cases demonstrate that a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim" such as "*O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (per curiam) (minor burns resulting from lying in vomit); *Norfleet v. Webster*, 439 F.3d 392, 394-95 (7th Cir. 2006) (arthritis); *Johnson v. Doughty*, 433 F.3d 1001, 1003-04, 1010 (7th Cir. 2006) (hernia); *Greeno v. Daley*, 414 F.3d 645, 649-51 (7th Cir. 2005) (heartburn and vomiting); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7th Cir. 1981) (fractured wrist)"); *Kelly v. Williams*, 2008 WL 413771, at *2, 4 (E.D. Cal. Feb. 13, 2008) (holding that the plaintiff's heart condition, described as "chest pain and heart palpitations," was a "serious medical condition[] for purposes of the Eighth Amendment"); *McClanahan v. United States*, 2007 WL 1072168, at *5 (W.D. Okla. Apr. 4, 2007) (holding that the plaintiff's intermittent atrial flutter—an irregular heart rhythm—and hypertension were serious medical conditions).

With respect to the second element of Gray's claim: "[T]he plaintiff must show that the official acted with the requisite culpable state of mind. This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Gayton*, 593 F.3d at 620 (internal quotation marks and citation

omitted). Gray need not show that he was "literally ignored," and evidence that he received "some" treatment does not negate a deliberate indifference claim. *Roe*, 631 F.3d at 857-58. However, Gray was not entitled to demand that a particular test be performed or that a certain course of treatment be followed. "[T]he Constitution is not a medical code that mandates specific medical treatment," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), and "[t]here is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field," *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court." *Estelle*, 429 U.S. at 107 (internal quotation marks omitted). To establish the requisite state of mind, a medical professional's decision not to order a particular test or refer an inmate to a specialist must have been "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).

Gray's January 2011 grievance indicates that he complained to Dr. Ghosh on December 15, 2010, January 2, 2011, and January 15, 2011, that his heart palpitations were getting worse, causing him pain and shortness of breath. The August 2011 grievance makes similar complaints. Yet the summary record includes no evidence that Gray was examined in response to these complaints until March 2012. Although Dr. Shute apparently put Gray on an alternate medical plan as of April 14, 2011, Doc. 100 at ¶ 20, Gray filed his second grievance a few months later, and there is no evidence in the record that Dr. Shute or anybody else examined or monitored Gray on this alternate medical plan until March 2012. Prison doctors cannot simply ignore an

inmate's complaints of pain. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (holding that "[d]elay in treating a condition that is painful even if not life-threatening may well constitute deliberate indifference"); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmates pain."). Dr. Ghosh was Stateville's medical director until March 31, 2011, and a reasonable jury could find that the lack of any examinations in response to Gray's December 2010 and January 2011 complaints, together with Dr. Ghosh's apparent failure to provide Dr. Garcia (the utilization management physician) with the materials he noted was missing in turning down Gray for a cardiology consultation, constitutes deliberate indifference. The same holds for Dr. Carter, who was medical director from July 25, 2011 onward. Accordingly, Gray's claims against Dr. Ghosh and Dr. Carter survive summary judgment.

## IV. Qualified Immunity

Defendants contend that they are entitled to qualified immunity. Doc. 96-2 at 8-9. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Two questions are asked in determining whether a defendant is entitled to qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right[,] and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013).

Defendants address only the first question, arguing that their "actions in providing care and treatment to the Plaintiff do not rise to the level of a constitutional violation," and incorporating by reference the contentions set forth earlier in their brief. Doc. 96-2 at 9. For the reasons discussed above, Defendants are wrong with respect to Dr. Ghosh and Dr. Carter, at least on the summary judgment record and applying the summary judgment standard. Defendants do not address the second question—probably in recognition that the relevant constitutional standards were clearly established at the relevant time—thereby forfeiting any argument they might have presented. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("[w]hen a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on").

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted in part and denied in part. The claims against Halloran are dismissed with prejudice, and the claims against Dr. Shute and Dr. Bautista are dismissed without prejudice. Gray may proceed with his claims against Dr. Ghosh and Dr. Carter.

July 3, 2014

_____
United States District Judge